S. THOMAS ANDERSON, District Judge,
concurring in part and dissenting in part.
While I concur with the majority’s opinion on the statute of limitations issue, I write separately to state my disagreement with the majority’s holding on the contract issues. There is simply a lack of clear and convincing evidence that a mutual mistake occurred when Coca-Cola reduced the parties’ 2009 Collective Bargaining Agreement (“CBA”) to writing. As to the issue of whether the parties agreed to annual wage increases in October as opposed to the March dates included in the final signed CBA, the evidence supporting each party’s position on the wage increases was fairly balanced. Accordingly, the union was not entitled to reformation of the contract. Because the union was not entitled to judgment as a matter of law and Coca-Cola was, I would reverse the judgment of the district court on the contract reformation and breach of contract issues.
*715 Under Michigan law, a party seeking reformation of a contract on the basis of mutual mistake must prove the mutual mistake by clear and convincing evidence. Casey v. Auto Owners Ins. Co., 273 Mich. App. 388, 729 N.W.2d 277, 285 (2006). As the party seeking reformation, the union has the burden of proof. Theophelis v. Lansing Gen. Hosp., 430 Mich. 473, 424 N.W.2d 478, 486-87 (1988) (“[T]he burden of proof is upon one seeking reformation of a written instrument”). The Michigan Supreme Court has described the clear and convincing evidence standard as “the most demanding standard applied in civil cases.” In re Martin, 450 Mich. 204, 538 N.W.2d 399, 410 (1995) (citation omitted). Clear and convincing evidence is that proof which “produce[s] in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable [the factfinder] to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue.” Id. (citation omitted). Put another way, evidence of mutual mistake must be so “clear and satisfactory, so as to establish the fact beyond cavil.” Crane v. Smith, 243 Mich. 447, 220 N.W. 750, 751 (1928) (citations omitted). A court of equity should not reform a written instrument “upon a probability, nor even upon a mere preponderance of evidence, but only upon a certainty of the error.” Holda v. Glick, 312 Mich. 394, 20 N.W.2d 248, 251 (1945) (citing Restatement of the Law of Contracts, § 504) (other citations omitted).
Based on the record before the district court, the union failed to prove by clear and convincing evidence that the parties actually agreed to annual wage increases on the October anniversary date of the 2009 CBA. The district court began by correctly finding that Appendix A’s use of the terms ‘Tear 1,” “Year. 2,” and ‘Tear 3” was ambiguous, stating “[t]he unions’ October interpretation is as plausible as Coca-Cola’s March interpretation.” See Local Union 2-2000 v. Coca-Cola Refreshments USA, Inc., 906 F.Supp.2d 731, 742 (W.D.Mich.2012). And yet the district court went on to hold that the Tentative Settlement Agreement (“TA”) containing the same ambiguous language constituted “clear and convincing evidence that both sides reached an agreement that the percentage wage increases would likewise occur on the anniversaries of the 2009 CBA.” Id. at 743 (“[T]he TA in this case, viewed in its larger context, is clear and convincing evidence that both sides reached an agreement that the percentage wage increases would likewise occur on the anniversaries of the 2009 CBA.”).
The district court based its conclusion on two features of the TA. First, the three-year CBA ran from October 1, 2009, through September 30, 2012, suggesting that the annual wage increases in ‘Tear 1, Year 2, Year 3” took effect on the October anniversary dates of the 2009 CBA. Id. Second, other fringe benefit increases took effect on non-anniversary dates listed in the 2009 CBA, “indicating] a different treatment of the wages in the parties’ agreement” and implying that the wage increases coincided with the anniversary date. Id.
These facts are certainly relevant to divining the meaning of the TA and tend to support the union’s position. However, they do not constitute clear and convincing evidence of a mutual mistake or demonstrate “a certainty of the error” in the final written contract. Holda, 20 N.W.2d at 251. Each parties’ interpretation of the ambiguous terms “Year 1, Year 2, and Year 3” is equally plausible and finds support in the record. Although the evidence cited by the district court is persuasive (and perhaps even preponderates), the *716 finding of mutual mistake is simply not clear and convincing in light of other record evidence, which the district court failed to consider.
For instance, the previous CBA provided for annual wage increases in March. Union members had just received an annual raise in March 2009 and, generally speaking, were not due for another annual raise until March 2010. The TA unambiguously stated that “[a]ll terms and conditions of the [2006 CBA] shall remain in full force and effect except as modified herein.” (PagelD 489.) The TA supports Coca-Cola’s position then that annual wage increases in the 2009 CBA would continue to take effect in March just as they did under the 2006 CBA. The provision also casts doubt on the union’s position about the October dates for the wage increases.
The union argues that if “Year 1” commenced in March 2010, the ‘Tear 1” wage freeze was to last from March 2010 to March 2011. As a result, bargaining unit members would actually go eighteen months from October 2009 until March 2011 without a raise. This argument ignores the fact that members had just received an annual bump in March 2009, six months before the 2009 CBA took effect, and would not expect another annual raise until March 2010. Thus, assuming March dates for wage increases with ‘Tear 1” running from March 2010 through March 2011, members would, in fact, experience a twelve-month wage freeze. The union’s position also ignores other evidence that Coca-Cola agreed to make two special payments to union members, a $500 “ratification bonus” in October 2009 and a $500 “lump sum payment” in January 2010, as a concession for the one-year wage freeze. See Dietrich Decl. ¶ 8, PagelD 1060 (“Coca-Cola proposed the [payments] ... to partially balance Coca-Cola’s proposal for the Tear 1’ wage freeze....”). Therefore, there is evidence from the TA to support Coca-Cola’s position about the March dates for wage increases.
Furthermore, the 2009 CBA included dates certain for increases in fringe benefits, but the district court failed to consider evidence showing that the TA simply carried over the same dates from the 2006 CBA. E.g. 2006 CBA, PagelD # 449 (providing for annual increases, which would take effect in May, in Coca-Cola’s match for employee 401k contributions); Local Union 2-2000, 906 F.Supp.2d at 784-35 (noting that the 2009 CBA provided for annual 401k matching increases in May as well). This is hardly surprising in light of the parties’ agreement that the terms of the 2009 CBA would default to the terms of the 2006 CBA “except as modified.” The fact then that the parties agreed in the 2009 CBA to annual benefits increases and on the same dates provided in the 2006 CBA support Coca-Cola’s position (as much as the union’s) and suggests that the parties assumed wage and benefit increases under the 2009 CBA would continue to occur annually and on the same dates provided in the 2006 CBA.
The district court also placed weight on the three-year duration of the 2009 CBA. Id. at 743 (“The TA provided that the ‘agreement duration’ was ‘October 1, 2009 — September 30, 2012.’ ”). This aspect of the TA is arguably the most compelling evidence for the union’s position that wage increases were due on the October anniversary dates of the 2009 CBA. Even so, whether wage increases were due in October or the following March, wage increases would still take effect during ‘Tear 1” or ‘Tear 2” or ‘Tear 3” of the CBA. For example, if ‘Tear 1” ran from October 2009 through October 2010, then a wage increase due in March 2010 would take effect during “Year 1.” The union *717 retorts that the notion of a six-month ‘Tear 1” or an eighteen-month “Year 3” is incomprehensible. Union’s Br. 39 (“In Wonderland, a ‘year’ may last 18 months on some occasions and six months on others, depending on Humpty Dumpty’s mood.”).
However, the union’s own course of dealing undercuts its argument on this point. During the negotiations, the union made the initial offer on wage increases, proposing that the new CBA run from October 1, 2009, through March 27, 2013, and that bargaining unit members receive a 3% raise in ‘Tear 1,” a 3.5% raise in ‘Tear 2,” and a 4% raise in ‘Tear 3.” (PagelD 458.)[1] Assuming that ‘Tear 1” began in October 2009, the union’s offer of a three and a half-year term obviously meant that ‘Tear 3” would run from October 2011 through March 2013, a span of eighteen months. Thus, the union itself proposed the very Carrollian treatment for “the word ‘year’ as sometimes meaning 18 months” that it so colorfully derides in this appeal. See also Union’s Br. 37 (“The parties never agreed to treat the word ‘year’ as sometimes meaning 18 months and sometimes six months. The parties never agreed that contract years should run inconsistently, from October 2009 until mid-March 2011 for Tear 1,’ from mid-March 2011 until mid-March 2012 for Tear 2,’ and from mid-March 2012 through September 2012 for Tear 3.’ ”).
The union’s bargaining also runs counter to the union’s position on appeal that the only possible, intended meaning of “Year 1, Year 2, Year 3” was the three-year term of the 2009 CBA. The union introduced the ‘Tear 1, Year 2, Year 3” concept into the negotiations on September 28, 2009, the parties’ last day at the bargaining table. Local Union 2-2000, 906 F.Supp.2d at 735. The parties signed the TA only hours after the union first proposed the ambiguous ‘Tear 1, Year 2, Year 3” language and did so in such a way that ‘Tear 3” actually meant eighteen months, and not twelve. This is hardly clear and convincing proof that the parties could only have understood the TA’s ‘Tear 1, Year 2, Year 3” to be literal, twelve-month years.
Perhaps more importantly, the union’s initial offer arguably assumed March wage increases, with the 3% raise in ‘Tear 1” taking effect in March 2010, the 3.5% raise in ‘Tear 2” in March 2011, the 4.0% raise in ‘Tear 3” in March 2012, and the CBA expiring in March 2013. Otherwise, the union’s proposed ‘Tear 1, Year 2, Year 3” language makes less sense. If the union was bargaining for October wage increases, as it now claims, the 3% raise in ‘Tear 1” would take effect October 2009, the 3.5% raise in October 2010, and the final 4% raise in October 2011. Bargaining unit members would then go from October 2011 through the expiration of the CBA in March 2013 without a raise. In other words, the union was proposing the ambiguous ‘Tear 1” approach to the wage increases under terms that would leave its membership without any raise for the final eighteen months of a forty-two month CBA. Therefore, the union’s initial offer with the ‘Tear 1, Year 2, Year 3” language plausibly shows that the union assumed wage increases in March and calls into doubt the district court’s conclusion that the TA’s use of ‘Tear 1, Year 2, Year 3” constituted clear and convincing evidence of October wage increases.
*718 In sum, none of the features of the TA cited by the district court amount to clear and convincing evidence of a mutual mistake in the final signed writing. I do not mean to say that the evidence clearly proves that the parties reached a final agreement for March wages increases. Indeed the parties’ final signed writing suffices to prove the March dates. The district court highlighted the lack of evidence showing that the parties ever agreed to the March dates for the wage increases. Local Union 2-2000, 906 F.Supp.2d at 744. However, because the union seeks reformation of a signed contract, the relevant inquiry is whether there is clear and convincing evidence of an agreement on the October dates. As the party seeking reformation, it is the union’s burden to prove that the parties actually agreed on the October dates for annual wage increases, and not Coca-Cola’s to prove the March dates. Theophelis, 424 N.W.2d at 486-87. For the reasons already discussed, the union failed to carry its burden to show a mutual mistake in the final signed writing.
Having concluded that the union failed to show by clear and convincing evidence that the March dates were a mistake, the district court’s reformation of the CBA should be reversed. Without proof of an agreement as to the October dates, reformation was improper. Hunt v. Triplex Safety Glass Co. of N. Am., 60 F.2d 92, 94 (6th Cir.1932) (“Before a contract may be reformed to express the true agreement of the parties, they must have so agreed, and we fail to find sufficiently cogent proof of such agreement.”) (emphasis added and internal citation omitted); Casey, 729 N.W.2d at 284-85 (“A court of equity has the authority to reform a contract to make it conform to the agreement actually made by the parties to the contract.”) (emphasis added).[2]
Notably the district court reached the reformation issue on the parties’ cross-motions for summary judgment. In order to prevail at summary judgment, the union had the burden to prove a mutual mistake in the final signed writing by clear and convincing evidence, Michigan’s “most demanding standard” in civil cases, and to do so in such a way that reasonable minds could not differ. In re Martin, 538 N.W.2d at 410. In other words, the union had a doubly-demanding burden to make its case at summary judgment. When viewed from this perspective, the district court misapplied the Rule 56 standard by granting the union judgment as a matter of law.
Federal Rule of Civil Procedure 56(a) provides that a party is entitled to summary judgment if the moving party “shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.” Fed. R.Civ.P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The precise issue presented to the district court in the union’s Rule 56 motion was whether the union could “prove by clear and convincing evidence to the degree that no rational finder of fact could conclude otherwise” that a mutual mistake had occurred where the final writing included March dates for annual wage increases. Hanover Ins. Co. v. Am. Eng’g Co., 33 F.3d 727, 730 (6th Cir.1994) (applying Kentucky law and reversing the reformation of a contract based on mutual mistake at summary judgment). Viewing the evidence in the light most favorable to Coca-Cola, as the district court was required to do in deeid *719 ing the union’s Rule 56 motion, the union failed to carry its burden. The evidence before the district court was insufficient to grant the union’s request for reformation because the union did not show a mutual mistake “by clear and convincing evidence to the degree that no rational finder of fact could conclude otherwise,” an essential element of the union’s reformation claim on which it alone bore the burden of proof. Therefore, the district court misapplied the summary judgment standard and erroneously granted the union judgment as a matter of law on the reformation issue.
What is more, the district court also failed to apply the correct standard in denying Coca-Cola’s Rule 56 motion. We have held that “any heightened burden of proof required by [governing] substantive law for an element of the [non-moving party]’s case, such as proof by clear and convincing evidence, must be satisfied by the [non-moving party]” in order to survive summary judgment. Beal ex rel. Putnam v. Walgreen Co., 408 FedAppx. 898, 902 (6th Cir.2010) (quoting Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir.1989)). In other words, the nonmoving party must “show in opposition to the motion for summary judgment that [it] can produce evidence which, if believed, will meet the higher standard.” Inge v. Rock Fin. Corp., 388 F.3d 930, 938 (6th Cir.2004).
Not only was the union not entitled to judgment as a matter of law, summary judgment in favor of Coca-Cola was proper because the union did not carry its “higher” burden. Even under the most favorable view of the proof, the union failed to adduce clear and convincing evidence of mutual mistake to support its plea for reformation. Rather the parties have essentially litigated to a draw. Instead of evaluating whether the union could meet its “higher” burden at summary judgment, the district court apparently shifted the burden to Coca-Cola to produce evidence in support of its claim about the March dates for wage increases. See Local Union 2-2000, 906 F.Supp.2d at 744 (finding that Coca-Cola “fails to provide evidence of agreement to the contractual language, other than to proffer the subsequent statements of Coca-Cola’s negotiators that Coca-Cola did not consider the March dates a ‘mistake’----”).[3] The district court improperly allocated the burden to Coca-Cola and then weighed Coca-Cola’s failure to prove the March dates in arriving at its conclusion to reform the contract. The district court should have focused on whether the union, as the party seeking reformation, had adduced clear and convincing evidence of the October dates, and not faulted Coca-Cola for failing to prove up the March dates in the final writing. In the absence of clear and convincing evidence of a mutual mistake, Coca-Cola was entitled to judgment as a matter of law on the reformation claim.
Both parties present cogent positions, which is exactly the problem with the district court’s decision to reform the 2009 CBA. The roughly equal strength of both arguments highlights the fact that the union did not carry its burden to establish a mutual mistake in the final writing by clear and convincing evidence. Rather than being “weighty and convincing” proof of a mutual mistake, the TA does not clearly and convincingly point to October dates for the wage increases in the 2009 *720 CBA. In re Martin, 538 N.W.2d at 410. The union has merely shown that the parties’ TA provided for wage increases in “Year 1, Year 2, and Year 3.” This proof is not clear and convincing evidence that the parties had actually agreed on October wage increases. Hunt, 60 F.2d at 94; Casey, 729 N.W.2d at 284-85. Therefore, I would reverse the judgment of the district court on the contract issues.

. Similarly, the 2006 CBA ran from March 25, 2006, to September 30, 2009, a term of three years and six months. The fact that the parties’ previous CBA included only a portion of a year further undercuts the inference that "Year 1,” "Year 2,” and “Year 3” clearly and necessarily refer to full twelve-month periods and not some fraction of a year covered by the CBA.

. Without proof of an actual agreement on dates certain for the annual wage increases, the TA’s default term, i.e. that "[a]ll terms and conditions of the [2006 CBA] shall remain in full force and effect,” would arguably control.

. The majority takes a similar approach, holding Coca-Cola to the burden to prove the absence of mistake as opposed to requiring the union to prove mutual mistake by clear and convincing evidence. In fact, the majority never states that the union adduced clear and convincing evidence of mutual mistake or that it did so "to the degree that no rational finder of fact could conclude otherwise.” Hanover Ins. Co., 33 F.3d at 730.